Matter of Relay Express Inc. (Commissioner of Labor) (2022 NY Slip Op 02594)

Matter of Relay Express Inc. (Commissioner of Labor)

2022 NY Slip Op 02594

Decided on April 21, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:April 21, 2022

532844
[*1]In the Matter of Relay Express Inc., Appellant. Commissioner of Labor, Respondent.

Calendar Date:March 22, 2022

Before:Lynch, J.P., Clark, Reynolds Fitzgerald, Colangelo and McShan, JJ.

Littler Mendelson, PC, Melville (William H. Ng of counsel), for appellant.
Letitia James, Attorney General, New York City (Linda D. Joseph of counsel), for respondent.

Lynch, J.P.
Appeal from a decision of the Unemployment Insurance Appeal Board, filed July 29, 2020, which assessed Relay Express Inc. for additional unemployment insurance contributions based upon remuneration paid to certain persons.
Relay Express Inc. (hereinafter RE) is a professional corporation engaged in the business of providing same-day delivery service, brokerage services, warehousing and other transportation logistics for its customers and clients. To provide these logistics and delivery services, RE retains the services of, among others, experienced and trained courier drivers using small vehicles and owner/operator delivery drivers using large transport vehicles (hereinafter collectively referred to as the drivers). Prior to providing any of their services, the drivers entered into written agreements with RE. As a result of an audit for the period January 1, 2013 to June 30, 2016, the Department of Labor issued a determination that assessed RE additional unemployment insurance contributions based upon remuneration paid to certain drivers included in the audit. Hearings ensued, and the Unemployment Insurance Appeal Board ultimately sustained the Department's determination assessing additional unemployment insurance contributions, finding, in relevant part, that RE exercised or reserved the right to exercise sufficient supervision, direction or control over the services performed by the delivery drivers to establish an employment relationship for purposes of additional unemployment insurance contributions. RE appeals.
We affirm. "Whether an employment relationship exists within the meaning of the unemployment insurance law is a question of fact, no one factor is determinative and the determination of the Board, if supported by substantial evidence on the record as a whole, is beyond further judicial review even though there is evidence in the record that would have supported a contrary conclusion" (Matter of Thomas [US Pack Logistics, LLC-Commissioner of Labor], 189 AD3d 1858, 1859 [2020] [internal quotation marks and citations omitted]; see Matter of Vega [Postmates Inc.-Commissioner of Labor], 35 NY3d 131, 136 [2020]). "Substantial evidence is a minimal standard requiring less than a preponderance of the evidence. As such, if the evidence reasonably supports the Board's choice, we may not interpose our judgment to reach a contrary conclusion" (Matter of Vega [Postmates Inc.-Commissioner of Labor], 35 NY3d at 136-137 [internal quotation marks, brackets and citations omitted]). "Traditionally, the Board considers a number of factors in determining whether a worker is an employee or an independent contractor, examining all aspects of the arrangement. But the touchstone of the analysis is whether the [purported] employer exercised control over the results produced by the worker or the means used to achieve the results. The doctrine is necessarily flexible because no enumerated list of factors can apply to every situation faced by a worker[*2], and the relevant indicia of control will necessarily vary depending on the nature of the work" (id. at 137 [internal quotation marks, brackets, footnote and citations omitted]; see Matter of Mayo [Epstein—Commissioner of Labor], 193 AD3d 1199, 1200 [2021]; Matter of Jordan [Alterna Holdings Corp.-Commissioner of Labor], 187 AD3d 1264, 1265 [2020]).
The record indicates that some indicia of control by RE was necessitated by regulatory and legal requirements governing the commercial transportation industry, which, alone, are not sufficient to establish an employer-employee relationship. "Nevertheless, such indicia of control can still be considered as part of the overall determination of control exercised over the [drivers]" (Matter of Joseph Fisheries Corp. [Commissioner of Labor], 202 AD3d 1238, 1240 [2022]; see Matter of Kablan [Medical Delivery Servs.-Commissioner of Labor], 201 AD3d 1220, 1221 [2022]; Matter of Cohen [Just Energy Mktg. Corp.-Commissioner of Labor], 117 AD3d 1112, 1112-1113 [2014], lv dismissed 24 NY3d 928 [2014]). As the Board found, the record, which includes a written agreement (standard equipment lease and independent contractor agreement) executed by RE and one of its drivers, establishes various indicia of control that RE exercised over the drivers that went beyond what was required by regulatory and legal requirements.
The record reflects that, among other things, RE solicited drivers using an online application system through which it could advertise and post available positions. Before retaining the drivers' services, RE screened potential drivers by conducting drug tests on some drivers, performing background checks and reviewing drivers' safety records, vehicle capacities and motor vehicle reports. Upon automatic renewal of the written agreement after six months, RE rescreened the drivers. RE operates its business through its digital platform, accessed via smartphone app, which connects its drivers with delivery job offers from its customers. If a driver did not possess a compatible smartphone, RE leased a smartphone to the driver so that the driver could access its digital platform. RE provided training when required and circulated a newsletter from the Department of Transportation informing the drivers of how to deal with inclement weather and events producing unusually high levels of traffic. Concerning payment, RE established the fee charged to its customers upon which the drivers' payment rates were arrived at, and all drivers were required to maintain a bank account and were paid by RE for any delays or wait time not caused by the drivers. The drivers were required to provide invoices to RE after completion of a delivery and within time frames established by RE, and the drivers were paid irrespective of whether the customer paid RE, which invoiced its customers following a successful delivery and managed the collection of payment. When establishing a driver's rate of payment, RE also factored into [*3]its consideration the experience of the driver and type of transportation vehicle being used. RE paid incentives to the drivers for safe driving and full compliance with inspections. RE also paid the drivers for the cost of any transportation license or permit required by law, as well as any fuel taxes, and RE required all drivers to obtain workers' compensation insurance or occupational hazard insurance, the latter of which RE could provide to the drivers (with a corresponding deduction in pay) if necessary. RE also covered all of its drivers under its general liability policy and required drivers to name RE as an additional insured party on any commercial auto insurance policies obtained by the drivers and to notify it within 30 days of cancelling said policy.
Although the drivers elected when to log into RE's app and accept delivery jobs, RE controlled the drivers' access to the delivery jobs and informed the drivers of the time and place of delivery as well as any other pertinent details, including any special customer requirements. Regarding deliveries, RE required the drivers to submit pickup and delivery confirmation, including obtaining electronic signatures from its customers on RE's app. If requested by the customer, RE required drivers to, in addition to following any other customer-imposed procedures, wear company uniforms and don identification badges and magnetic signs bearing RE's company logo. For late deliveries, RE could require the drivers to provide an explanation and would notify customers of the delay. In addition to submitting any paperwork and/or trip logs required by law, RE required drivers to submit customer-required and other documentation by certain time frames that it imposed in order for the drivers to receive payment without delay or interruption. RE maintained responsibility for handling customer complaints and reserved the right to remove a driver from its roster due to complaints from customers. RE could also remove a driver from its roster for refusing to accept jobs on too many occasions, retained the risk of loss if goods were damaged in transit, unless the driver's negligence was at fault for the damage, and provided corrective instructions to the driver when applicable.
Although some of the control exercised by RE was occasioned by the regulated nature of the commercial transportation industry, we find that, in view of the foregoing, substantial evidence supports the Board's determination that an employment relationship existed, notwithstanding evidence in the record that could support a contrary conclusion (see Matter of Vega [Postmates Inc.-Commissioner of Labor], 35 NY3d at 138; Matter of Sow [NY Minute Messenger, Inc.-Commissioner of Labor], 201 AD3d 1064, 1065 [2022]; Matter of Fiorelli [Stallion Express, LLC-Commissioner of Labor], 201 AD3d 1045, 1047 [2022]; Matter of Quesada [Columbus Mgt. Sys., Inc.—Commissioner of Labor], 198 AD3d 1036, 1037 [2021]). To the extent that we have not addressed [*4]RE's remaining contentions that are properly before us, they are either academic in light of our decision or have been considered and found to be without merit.
Clark, Reynolds Fitzgerald, Colangelo and McShan, JJ., concur.
ORDERED that the decision is affirmed, without costs.